UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Spreckels Sugar Company, Inc., <br><br>Plaintiff, <br><br>v. <br><br>United Food and Commercial Workers, Local 135, AFL-CIO, CLC, <br><br>Defendant. | Case No.: 23CV413GPC(KSC) <br><br>**ORDER DENYING PLAINTIFF'S "EMERGENCY MOTION FOR PRELIMINARY INJUNCTION"** <br><br>[Dkt. No. 4.] |

On March 6, 2023, Plaintiff filed a complaint under Section 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a), and an "emergency preliminary injunction"[1] enjoining Defendant from striking as threatened on March 7, 2023. (Dkt. Nos. 1, 4.) At the hearing, the Court was informed that a strike commenced on March 9, 2023. Pursuant to the Court's briefing schedule, Defendant filed an opposition on March

---

[1] By filing an "emergency motion for preliminary injunction", it is not clear whether Plaintiff is seeking an "ex parte motion for temporary restraining order" or an expedited "motion for preliminary injunction." Nonetheless, the Court construes the "emergency preliminary injunction" as an ex parte motion for temporary restraining order and disregards the procedural defect due to the urgent nature of the issue. In future filings, Plaintiff must strictly comply with the Federal Rules of Civil Procedure, this district's civil local rules and the undersigned chambers rules.

8, 2023. Late on March 8, 2023, Plaintiff filed a reply.[2] (Dkt. No. 14.) A hearing was held on March 10, 2023. (Dkt. No. 15.) The Court ordered supplemental briefing which was filed on March 11, 2023.[3] (Dkt. Nos. 17,18.) Based on the reasoning below, the Court DENIES Plaintiff's "emergency motion for preliminary injunction."

## Background

Plaintiff Spreckels Sugar Company, Inc. ("Plaintiff") is an employer as that term is defined under the Labor Management Relations Act of 1947. (Dkt. No. 1, Compl. ¶ 3.) Defendant United Food and Commercial Workers, Local 135, AFL-CIO, CLC is a voluntary, unincorporated association doing business as a labor organization under 20 U.S.C. § 185. (*Id.* ¶ 4.) Defendant, acting as a labor organization, represents certain Spreckels employees at its Brawley factory and outside receiving station serving the Brawley factory. (*Id.*) Defendant is the collective bargaining representative for these employees and is covered by the parties' collective bargaining agreement ("CBA") effective January 1, 2022 to January 5, 2025. (*Id.*; Dkt. No. 1-2, Compl., Ex. A.)

In 2021, as part of the CBA negotiations, Plaintiff proposed to terminate the defined benefit pension plan and replace it with a 401(k) retirement plan, provided information and examples showing the estimated total value of certain employees' retirement benefits under the pension plan and informed that if there is a transition to a 401(k) plan, employees would get the option to receive the balance of their defined benefit retirement benefits as a direct cash payment or to roll over the balance to an individual retirement account. (Dkt. No. 7-1, Walters Decl. ¶ 5.) Defendant agreed to the proposal. (*Id.* ¶ 6.)

---

[2] Plaintiff filed an ex parte request for leave to file a reply which the Court granted. (Dkt. Nos. 12, 13.)
[3] On March 13, 2023, without leave of Court, Plaintiff filed a notice of supplemental authority. (Dkt. No. 19.) Nonetheless, the Court notes that the two district court cases pre-date *Buffalo Forge Co. v. United Steelworkers of America, AFL-CIO*, 428 U.S. 397, 408 (1976), and does not alter the Court's ruling in this case.

SECTION 15—PENSION PLAN of the CBA provides: "[e]ffective December 31, 2021, the pension plan froze and will move to termination. In place of the pension plan is an enhanced 401(k) for year-round employees. See Section 16.16 for specifics." (Dkt. No. 1-2, Compl., Ex. A.) In turn, SECTION 16.16 -- 401(K) PLAN provides,

> The Employer will make available a 401(k) Plan for its year-round-employees with the employer providing an automatic three percent (3%) contribution plus a fifty percent (50%) match up to an employee's six percent (6%) contribution. The employer will provide this benefit for six (6) years, through December 31, 2027. The cost of establishing and administering the Plan shall be paid for by the Employer. The Plan shall be funded solely by contributions of the participants.

(*Id.*)

According to Defendant, Plaintiff began the process of terminating the pension plan in January 2022 with the Internal Revenue Service approving the plan termination in July 2022. (Dkt. No. 7-1, Walters Decl. ¶ 7.) However, Plaintiff did not send out the required "Notice of Plan Benefit" to employees until October 2022. (*Id.*) Since October 2022, represented employees received three updated estimates of the worth of their defined benefit retirement but the amount of each estimate was lower than the previous ones totaling about $10,000-$30,000 less than the value in 2021. (*Id.*) After consulting with its pension consultant, Defendant learned that Plaintiff had delayed termination of the pension and if it had terminated the pension more promptly, even by a few months, the decrease in the worth of each employee's benefit would have been less. (*Id.* ¶ 8.) Further, according to Defendant, Plaintiff used some liberties that had not been negotiated in terminating the pension plan such as not using an early retirement adjustment in calculating the lump sum worth of employees' retirement benefit as it often increases the worth of the benefit. (*Id.*)

Defendant sought information from Plaintiff about the plan termination and after communications and receipt of information from Plaintiff, on January 25, 2023, Defendant requested to bargain over the effects of the pension termination. (*Id.* ¶ 9, 11;

Dkt. No. 7-3, Ex. A.) In response, Plaintiff stated that while it was not legally obligated to engage in further effects bargaining because the pension plan termination had already been negotiated, and any request was untimely, it was open to "reengage in effects bargaining" in order to further "collaborative labor relations." (Dkt. No. 7-1, Walters Decl. ¶¶ 11-12; Dkt. No. 7-3, Ex. A; Dkt. No. 7-4, Ex. B.)

On February 13, 2023, Plaintiff and Defendant commenced effects bargaining over the pension plan termination and exchanged information. (Dkt. No. 1, Compl. ¶ 10.) At the meeting, Defendant states it made a specific proposal to resolve its concerns about how Plaintiff proceeded to terminate the pension plan as well as asked questions about how the pension plan was terminated. (Dkt. No. 7-1, Walters Decl. ¶ 13.) On February 17, 2023, Plaintiffs provided a written response to Defendant's questions but did not respond to the Union's proposal or explain the delay. (Dkt. No. 7-5, Ex. C.)

Due to the repeated lack of response to Defendant's concerns about the process Plaintiff used to terminate the pension plan, it filed an unfair labor practice ("ULP") charge with the National Labor Relations Board ("NLRB") around February 22, 2023 alleging Plaintiff failed to negotiate in good faith. (Dkt. No. 7-1, Walters Decl. ¶ 15; Dkt. No. 7-6, Ex. D.) According to Defendant, ULP concerns Plaintiff's conduct in its underlying negotiations and discussions about the termination of the defined benefit pension plan and does not relate to the terms of the CBA regarding the employer's intent to terminate the plan and description of the 401(k) plan. (Dkt. No. 7-1, Walters Decl. ¶ 16.) Defendant does not believe that the underlying dispute is subject to the CBA and has not filed a grievance related to the pension plan dispute. (*Id.*)

Defendant informed employees about the ULP and coordinated a "strike vote" on March 1, 2023 where the employees voted in favor of an unfair labor practice strike to start on March 6, 2023. (*Id.* ¶ 18; Dkt. No. 1, Compl. ¶ 11.) Prior to the strike vote, around February 24, 2023, Plaintiff distributed and required employees to sign a "Frequently Asked Questions" ("FAQ") document stating that "(1) there is a no-strike clause in the collective bargaining agreement, (2) if the Union calls a strike, it will be

violating the collective bargaining agreement, and (3) the no-strike clause prohibits employees from striking, without any caveats." (Dkt. No. 7-1, Walters Decl. ¶ 19; Dkt. No. 7-7, Ex. E.) Defendant then filed another ULP charge with the NLRB charging that Plaintiff's FAQ interferes with the employees' right to engage in a ULP strike. (Dkt. No. 7-1, Walters Decl. ¶ 19; Dkt. No. 7-8, Ex. F.)

SECTION 16.9 – STRIKES AND LOCKOUTS of the CBA provides "[d]uring the term of this Agreement, there shall be no cessation[,] interruption or delay of work or other action by the employees or the Union which impairs the Employer's operations or financial condition or affects the distribution of its products, including without limitation, strikes (including sympathy strikes), work stoppages, slowdowns, picketing boycotts, or corporate campaigns. During the term of this Agreement there shall be no lockout by the Employer." (Dkt. No. 1-2, Ex. A at 28.)

Initially, Defendant informed its employees that it would sanction a ULP strike on Monday, March 6, 2023; however, when Plaintiff agreed to bargain with it on March 6, 2023, Defendant agreed to delay the strike. (Dkt. No. 1, Compl. ¶ 14; Dkt. No. 1-5, Compl., Exs. D, E; Dkt. No. 7-1, Walters Decl. ¶ 20.) The parties engaged in bargaining sessions on March 6, and 8, 2023 without a resolution, and because there was no agreement, Defendant said it intended to strike on March 9, 2023. (Dkt. No. 14-1, Cecere Decl. ¶¶ 8, 9.) When Plaintiff's counsel communicated that it was willing to continue negotiations, Defendant's representative stated, "we will get back to you." (*Id.* ¶ 10.) The employees started striking on March 9, 2023.

The complaint also alleges that Defendant has failed to comply with the grievance process under the CBA which requires arbitration of any disputes that arise under the CBA. (Dkt. No. 1, Compl. ¶ 20.) Instead of proceeding with the grievance under the CBA, Defendant submitted a ULP with the NLRB without articulating any specific actions or conduct by Plaintiff and has refused to present Plaintiff with a grievance or details of its ULP dispute as mandated by Section 11.1 of the CBA. (*Id.* ¶ 21.) Plaintiff seeks an injunction against Defendant from continuing with its planned strike activity and

1  requiring Defendant to adhere to the grievance procedure in the CBA that culminates in
2  arbitration.  *(Id.* ¶¶ 31, 32.)

### Discussion

The purpose of a TRO is to preserve the status quo before a preliminary injunction hearing may be held; its provisional remedial nature is designed merely to prevent irreparable loss of rights prior to judgment.  *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 439 (1974).  The legal standard that applies to a motion for a TRO is the same as a motion for a preliminary injunction.  *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.,* 240 F.3d 832, 839 n. 7 (9th Cir. 2001).  To obtain a TRO or preliminary injunction, the moving party must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm to the moving party in the absence of preliminary relief; (3) that the balance of equities tips in the moving party's favor; and (4) that an injunction is in the public interest.  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief," *Winter*, 555 U.S. at 22, and the moving party bears the burden of meeting all four *Winter* prongs.  *See DISH Network Corp. v. FCC*, 653 F.3d 771, 776-77 (9th Cir. 2011).

Plaintiff argues likelihood of success on the merits, likelihood of irreparable harm and balance of equites weigh in its favor in support of its motion; however, Defendant only challenges the likelihood of success on the merits.

**A.  Likelihood of Success on the Merit**

    **1.  Norris-Laguardia Act**

"The Norris-LaGuardia Act ["NLA"] contains severe strictures against the issuance of injunctions in cases involving or growing out of labor disputes." *Matson Plastering Co., Inc. v. Operative Plasterers and Cement Masons Int'l Ass'n, AFL-CIO, Plasterers Local Union No. 295*, 633 F.2d 1307, 1308 (9th Cir. 1980) (citation omitted).  It provides that "[n]o court of the United States . . . shall have jurisdiction to issue any . . . temporary or permanent injunction in a case involving or growing out of a labor dispute,

except in strict conformity with the provisions of this Act." 29 U.S.C. § 101.  Section 113(c) defines "labor dispute" to include "any controversy concerning terms or conditions of employment." 29 U.S.C. § 113(c).  The United States Supreme Court "has consistently given the anti-injunction provisions of the Norris-LaGuardia Act a broad interpretation, recognizing exceptions only in limited situations where necessary to accommodate the Act to specific federal legislation or paramount congressional policy." *Jacksonville Bulk Terminals, Inc. v. Int'l Longshoremen's Ass'n*, 457 U.S. 702, 708 (1982).

### 2. *Boys Market* Exception to the NLA

In *Boys Market*, the Supreme Court carved out a "narrow" exception to the anti-injunction provision of the NLA permitting a court to grant injunctive relief against a strike "only with the situation in which a collective-bargaining contract contains a mandatory grievance adjustment or arbitration procedure." *Boys Market, Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235, 253 (1970).  In *Boys Markets*, the union demanded that supervisory employees stop performing tasks claimed by the union to be union work. *Id.* at 239.  When the employer did not agree, the union struck. *Id.* Because "there [was] no dispute that the grievance in question was subject to adjustment and arbitration under the collective-bargaining agreement and that the petitioner was ready to proceed with arbitration at the time an injunction against the strike was sought and obtained", the Court ruled that the union could be enjoined from striking over a dispute which it was bound to arbitrate. *Id.* at 254.  *Boys Markets* overruled *Sinclair*[4] and held that, taking into consideration the NLA's anti-injunction provisions and the strong federal policy favoring arbitration, an exception to the NLA must be recognized in cases where

---

[4] *Sinclair Refining Co. v. Atkinson*, 370 U.S. 195 (1962), held that the Norris-LaGuardia Act bars a federal district court from enjoining a strike in breach of a collective-bargaining agreement, even where that agreement includes provisions for binding arbitration of the grievance concerning which the strike was called.

the employer seeks to enforce the union's contractual obligation to arbitrate grievances instead of striking over them. *Jacksonville Bulk Terminals,* 457 U.S. at 708.

Subsequently, in *Buffalo Forge*, the Supreme Court refined the *Boys Market* exception in a case where the strike was over a grievance that the union had not agreed to arbitrate. *Buffalo Forge Co. v. United Steelworkers of America, AFL-CIO*, 428 U.S. 397, 408 (1976). In that case, the union employees engaged in a sympathy strike in support of sister unions negotiating with the employer and, while the CBA included a no-strike provision, it did not ban sympathy strikes. *Id.* at 405. Based on this, the parties disputed whether the sympathy strike violated the no-strike provision.

The Court explained that because the CBA included an arbitration clause that covered the meaning and application of the no-strike clause, the question whether the sympathy strike "violated the no-strike clause, and the appropriate remedies if it did, [were] subject to the agreed-upon dispute-settlement procedures of the contracts and [were] ultimately issues for the arbitrator." *Id.* The Court held that while the employer was entitled to a court order directing the union to arbitrate, it did not warrant an injunction pending a decision by the arbitrator because such an injunction "would cut deeply into the policy of the Norris-LaGuardia Act and make the courts potential participants in a wide range of arbitrable disputes under the many existing and future collective-bargaining contracts." *Id.* at 410-11. Distinguishing its case from *Boys Market*, the Court, in *Buffalo Forge*, noted the *Boys Market* exception to be a "narrow one" concerning a dispute subject to the grievance and arbitration clauses, and "it was also clear that the strike violated the no-strike clause accompanying the arbitration provisions." *Id.* at 406; *see Jacksonville Bulk Terminals, Inc.*, 457 U.S. at 709 (*Buffalo Forge* held that "the *Boys Markets* exception does not apply when only the question whether the strike violates the no-strike pledge, and not the dispute that precipitated the strike, is arbitrable under the parties' collective-bargaining agreement.").

Afterwards, the Ninth Circuit, in *Matson*, acknowledged the *Boys Market* exception, but explained that the Court, in *Buffalo Forge*, highlighted that the "district

court had no jurisdiction to consider the merits of the underlying dispute over the proper interpretation of the contract. The district court's jurisdiction in *Buffalo Forge* was limited to deciding whether the dispute over contract interpretation was arbitrable under the bargaining agreement." *Matson Plastering Co., Inc.*, 633 F.2d at 1308.  In *Matson,* the parties disputed over whether the union's strike was barred by the no-strike clause of the bargaining agreement.  Specifically, the employer and the union disputed whether the employer's refusal to pay an assessment imposed against the union for late payment of contributions fell under the express exception to the no-strike clause reserving the right to strike for non-payment of such contributions.  *Id.* at 1309.  Relying on *Buffalo Forge*, the Ninth Circuit held that the district court had no jurisdiction to issue an injunction.  *Id.*

Therefore, for the *Boys Market* exception to the Norris-LaGuardia Act to apply, there must be an "undisputed contractual obligation [1] not to strike and [2] to submit to binding arbitration." *Matson Plastering Co., Inc*., 633 F.2d at 1308.

Plaintiff argues that the *Boys Market* exception to the NLA applies in this case because the CBA includes a no-strike clause and includes a grievance/arbitration provision which it is willing and able to submit to.  (Dkt. No. 4 at 7-8.)  Defendant responds that the exception does not apply because the no-strike contractual provision is disputed and the underlying pension issue is not arbitrable.  (Dkt. No. 7 at 13-15; 16-18.)

### a. **Whether the Underlying Pension Plan Issues are Undisputedly Arbitrable**

Plaintiff asserts that the grievance and arbitration provisions of the CBA are broad governing all disputes arising from the terms of the CBA and covers the termination of the pension plan as provided under Section 15 of the CBA. (Dkt. No. 14 at 4-5; *see* Dkt. No. 4 at 7.)  Defendant maintains that there is a dispute because the pension plan grievances underlying the strike are non-arbitrable extra-contract disputes such that the *Boys Market* exception does not apply.  (Dkt. No. 7 at 18.)

An arbitration agreement requiring arbitration of any dispute "arising out of or relating to" the agreement is "broad and far reaching." *See Chiron Corp. v. Ortho*

*Diagnostic Sys., Inc*., 207 F.3d 1126, 1131 (9th Cir. 2000).  Particularly in the labor context, there is a congressional policy "in favor of settlement of disputes by the parties through the machinery of arbitration" and "[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *United Steelworkers of America v. Warrior & Gulf Navigation Co*., 363 U.S. 574, 582-83 (1960).  The "arbitral forum is the primary arena for the settlement of labor disputes." *United Steelworkers of America v. N.L.R.B.*, 530 F.2d 266, 273 (3d Cir. 1976).  There is a "well-known presumption of arbitrability of labor disputes." *Gateway Coal Co. v. United Mine Workers of America*, 414 U.S. 368, 377 (1974).

The parties do not dispute that the CBA includes a mandatory grievance adjustment or arbitration procedure; however, the parties dispute whether the underlying grievances giving rise to the strike are arbitrable**.**  *See Matson*, 633 F.2d at 1308 (the district court's jurisdiction in *Buffalo Forge* was limited to deciding whether the dispute over contract interpretation was arbitrable under the bargaining agreement.)

Section 11 of the CBA provides that "[a]ll grievances, including any and all matters of controversy, dispute or disagreement of any kind or character existing between the parties and arising out of or in any way involving the interpretation or application of the terms of this Agreement must be presented to the Employer in writing . . . ."  (Dkt. No. 1-2, Compl., Ex. A, CBA § 11.1.)  Only after the grievance procedure fails, then the grievance may be submitted to arbitration.  (*Id.* § 11.2.)  The CBA language of "any and all matters of controversy, dispute or disagreement of any kind or character" and "arising out of or in any way" are to be broadly construed and are far reaching.  *See Chiron Corp*., 207 F.3d at 1131.

The CBA provision, in this case, addressing the termination of the pension plan provides "[e]ffective December 31, 2021, the pension plan froze and will move to

termination. In place of the pension plan is an enhanced 401(k) for year-round employees. . . ." (Dkt. No. 1-2, Compl., Ex. A, CBA ¶ 15.)

The Union identifies several reasons for its strike. It relies on the "concern that Spreckels had withheld information in initial bargaining in 2021 and/or made choices about how to terminate the plan that were not negotiated". (Dkt. No. 7-1, Walter Decl. ¶ 15.) It also raises allegations that Plaintiff's delay in executing the termination of the pension plan in 2022, when the CBA was in effect, caused the significant decline in the worth of the employees' defined benefits. (*Id.* ¶¶ 14, 15.) Further, it asserts that the strike was triggered by Plaintiff's "repeated failure to adequately respond to the Union's concerns about the process [Plaintiff] had followed in terminating the pension plan". (*Id.* ¶ 15.) Specifically, the Union argues that Plaintiff failed to explain the delay in terminating the plan which may have caused the value of the employees' benefits to decrease significantly. (*Id.* ¶¶ 14, 15.)

Based on these reasons for striking, Defendant maintains that there was no grievance to submit related to Section 15 because the plan was already frozen before the effective date of the CBA and the phrase "will move to termination" does not provide any source of a dispute to be brought to arbitration. It is Plaintiff's position that because the grievance/arbitration provision applies to the "application" of Section 15, which includes termination, it covers the grievance but does not address whether it applies to the CBA negotiation conduct in 2021.

The Court recognizes there are two separate periods of time encompassed by Defendant's pension plan grievance. The first involves the alleged misrepresentations made during negotiations of the CBA to induce the employees to terminate the pension plan in 2021, when the CBA was not yet in effect, and the second relate to actions taken to terminate the pension plan after the CBA went into effect. The Court finds that a good faith dispute exists whether the 2021 negotiations are subject to the CBA arbitral process. As to the 2022 actions in terminating the pension plan, after the Union raised issues regarding the method of Plaintiff's pension plan termination, Plaintiff's initial response

was that it, too, believed that the issue was not covered by the CBA. Plaintiff stated it was not required to engage in further effects bargaining over the pension plan termination since it had been negotiated in early 2022 and the Union knew the potential impacts at that time, and that the grievance was untimely. (Dkt. No. 7-3, Ex. A; Dkt. No. 7-4, Ex. B.) By its initial push back, Plaintiff appears to have believed the grievance fell outside the scope of the CBA. Given these circumstances, it cannot be said that "there [was] no dispute that the grievance in question was subject to adjustment and arbitration under the collective-bargaining agreement." *See Boys Market, Inc.*, 398 U.S. at 254. Accordingly, the *Boys Market* exception does not apply to the facts of this case and the Court lacks the authority to grant the Plaintiff's request for an injunction.

While the NLA prohibits an injunction in this case, the Court finds that the disputes between the parties are subject to the grievance and arbitration process so that an arbitrator can decide whether any or all of the grievances between the parties are subject to arbitration.

### b.     Whether the No-Strike Provision is Undisputed

The Court further finds that there is a dispute whether the Union's ULP strike violates the CBA's no-strike clause. Plaintiff argues that the no-strike provision unequivocally bars the employees from striking. (Dkt. No. 4 at 7-8.) Relying on *Mastro Plastics Corp. v. N.L.R.B.,* 350 U.S. 270, 280 (1956). Defendant responds that there is a real dispute whether the ULP strike[5] falls under the no-strike provision of the CBA. (Dkt. No. 7 at 14-15.)

*Mastro Plastics* involved a petition to enforce an NLRB's order where the employer had engaged in "a flagrant example of interference by the employers with the expressly protected right of their employees to select their own bargaining representative." *Mastro Plastics Corp.*, 350 U.S. at 278. In the case, the employees went

---

[5] The parties do not dispute that the strike is an unfair practices labor strike.

on strike after the company discharged an employee for failing to transfer his allegiance to the union it preferred and then discharged 76 other striking employees. *Id.* at 273, 275, 277. The bargaining agreement included a provision where "[t]he Union agree[d] that during the term of this agreement, there shall be no interference of any kind with the operations of the employers, or any interruptions or slackening of production of work by any of its members. The Union further agree[d] to refrain from engaging in any strike or work stoppage during the term of this agreement." *Id.* at 281. After engaging in contract interpretation, the Court held that the contract "did not waive the employees' right to strike solely against the unfair labor practices of their employers" despite the "no strike" provision in the agreement. *Id.* at 284. The NLRB "requires that a waiver must generally be "clear and unmistakable."" *N.L.R.B. v. Southern California Edison Co.*, 646 F.2d 1352, 1364 (9th Cir. 1981).

The NLRB, subsequently, interpreted the right to strike under *Mastro Plastics* as limited to disputes involving "serious" unfair labor practices, *Arlan's Dep't Store of Michigan, Inc.*, 133 N.L.R.B. 802 (1961) (interpreting *Mastro Plastics* that "only strikes in protest against serious unfair labor practices should be held immune from general no-strike clauses."), which the Ninth Circuit adopted in *Servair, Inc. v. N.L.R.B.*, 726 F.2d 1435, 1441 (1984) (citing rule in *Arlan's* and stating "under the *Mastro Plastics* rationale, we must determine whether the unfair labor practice was "serious."). An unfair labor practice is "'serious" if it is 'destructive of the foundation on which collective bargaining must rest.'" *Servair*, 726 F.2d at 1441 (quoting *Mastro Plastics Corp.*, 350 U.S. at 281). In *Servair*, the Ninth Circuit held that the NLRB's determination, that the employer's repeated interference with its employees' selection of a bargaining representative, including the discharge of an employee, was a "serious" unfair labor practice under *Mastro Plastics,* was not arbitrary. *Id.* at 1442.

According to Defendant, the ULP strike, in this case, is not subject to the no-strike clause in the CBA because it does not contain a "clear and unmistakable" waiver of the right to engage unfair labor practice strike relying on *Mastro Plastics*. (Dkt. No. 7 at 12-

13

13.) Therefore, under *Buffalo Forge*, because it is disputed whether the strike is barred by the no-strike provision, no injunction may issue. In reply, Plaintiff argues that the ULP strike is subject to the no-strike clause because *Mastro Plastics'* holding only applies to "serious" unfair labor practices which is not the case here. (Dkt. No. 14 at 2.)

The no-strike provision states, "[d]uring the term of this Agreement, there shall be no cessation[,] interruption or delay of work or other action by the employees or the Union which impairs the Employer's operations or financial condition or affects the distribution of its products, including without limitation, strikes (including sympathy strikes), work stoppages, slowdowns, picketing boycotts, or corporate campaigns. During the term of this Agreement there shall be no lockout by the Employer." (Dkt. No. 1-2, Ex. A at 28.) Moreover, the CBA provides that "[a]ll grievances, including any and all matters of controversy, dispute or disagreement of any kind or character existing between the parties and arising out of or in any way involving the interpretation or application of the terms of this Agreement" are subject to the grievance/arbitration provision. (*See* Dkt. No. 1-2, Compl., Ex. A, CBA § 11.1.) Therefore, the no-strike provision, Section 16.9 of the CBA, is a term of the Agreement subject to the grievance/arbitration process and whether the work stoppage falls under the no-strike provision of the CBA must be resolved through the grievance/arbitration process. *See Buffalo Forge*., 428 U.S. at 408.

Further, whether Plaintiff engaged in an unfair labor practice and whether it was "serious" within the meaning of *Mastro Plastics* is also disputed but an issue subject to the NLRB's exclusive jurisdiction. *See San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 245 (1959) ("[w]hen an activity is arguably subject to § 7 or § 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted."). The NLRB has primary, exclusive jurisdiction over unfair labor

practices as provided under the National Labor Relations Act ("NLRA")[6] while an arbitrator has the authority given to him or her by the CBA. *See George Day Const. Co., Inc. v. United Brothers of Carpenters and Joinders of America, Local 354,* 722 F.2d 1471, 1474, 1480 (9th Cir. 1984) ("issues arising under sections 7 and 8 of the NLRA are within the exclusive competence of the Board" and "arbitrator's jurisdiction is rooted in the agreement of the parties"); *see N.L.R.B. v. Northeast Oklahoma City Mfg. Co.*, 631 F.2d 669, 675 (10th Cir. 1980) ("Whether a Section 8(a)(5) violation, if found, rises to the level of a "serious" unfair labor practice, for example, requires an interpretation of the Act, not of the contract.  Such a determination is within the exclusive province of the Board, not of an arbitrator.").

Conduct may be a violation of an "arbitrable contract" as well as "an unfair labor practice" which raises the issue of concurrent jurisdiction. *Id.* at 1481 (recognizing the problems arising from concurrent jurisdiction over acts constituting simultaneously a breach of contract and an unfair labor practice).  An arbitrator may make a determination on whether an employer's conduct constitutes an unfair labor practice and the NLRB may interpret a CBA, but ultimately, the interpretation of the CBA falls on the arbitrator and a determination on whether conduct constitutes an unfair labor practice falls on the Board. *See Int'l Longshore and Warehouse Union v. N.L.R.B.*, 978 F.3d 625, 640 (9th Cir. 2020) ("[a]lthough the Board has occasion to interpret collective-bargaining agreements in the context of unfair labor practice adjudication, the Board is neither the sole nor the primary source of authority in such matters."); *Stephenson v. N.L.R.B.*, 550 F.2d 535, 537 (9th Cir. 1977) ("case law is settled . . . that the Board has considerable discretion to accept an arbitrator's award and decline to exercise authority over an alleged unfair labor practice.").

---

[6] "The Board is empowered . . . to prevent any person from engaging in any unfair labor practice . . . affecting commerce."  29 U.S.C. § 160.

Ultimately, the issue of whether the strike falls under the no-strike provision of the CBA, and whether Plaintiff's conduct constitutes a "serious" unfair labor practice[7] are disputed and cannot be resolved by the Court. Because of these ongoing disputed issues on whether the work stoppage violates the no-strike provision of the CBA, the *Boys Market* exception does not apply to the facts of this case.

In sum, the Court concludes that Plaintiff has failed to demonstrate a likelihood of success on the merits. Because Plaintiff has failed to demonstrate a likelihood of success on the merits that the exception to *Boys Market* applies, the Court need not address the remaining *Winter* factors. *See Doe v. Reed*, 586 F.3d 671, 681 n.14 (9th Cir. 2009) ("Because we conclude that Plaintiffs have failed to satisfy the first *Winter* factor—likelihood of success on the merits—we need not examine the three remaining Winter factors,"). Accordingly, the Court DENIES Plaintiff's "emergency motion for preliminary injunction."

## Conclusion

Based on the above, the Court DENIES Plaintiff's "emergency motion for preliminary injunction."

IT IS SO ORDERED.

Dated: March 14, 2023

Hon. Gonzalo P. Curiel
United States District Judge

---

[7] On February 22, 2023 and February 28, 2023, Defendant filed two charges of unfair labor practices with the NLRB. (Dkt. No. 7-6; Ex. E; Dkt. No. 7-8, Ex. F.)